\*E. P. Wilmot v. John H. Lyon & Co.

1. **Sufficient Allegation of Ownership.**

Where goods are sought to be replevied on the ground that they have been fraudulently purchased, and the party replevying them claims to be the general owner, an allegation that, "the defendant wrongfully detains from plaintiffs the following goods and chattels of the plaintiffs," will be held to be a sufficient allegation of ownership on the part of the plaintiffs.

2. **Title of the Vendor to Goods Purchased From Him by Fraud.**

Where goods have been purchased by fraud from a merchant, and the latter undertakes to rescind the sale and replevin the property, the title of such merchant in such goods will be that of a general owner and not that of a special owner.

3. **Person Obtaining Goods by False Pretenses is not Entitled to Demand Before Replevying Them.**

A person who obtains goods by false pretenses, does not lawfully come into their possession, and is not entitled to demand for their return before bringing an action in replevin for such goods.

4. **Return of Notes Before Instituting Proceedings in Replevin, not Necessary.**

Where a person fraudulently purchased a quantity of goods and executed a note for the same, and afterwards the seller rescinds the sale and replevins the goods: *Held*, that it is not necessary for the seller to first return the note to the purchaser before bringing the suit in replevin. It is sufficient if the seller has the note in his possession at the commencement of the suit, and brings the same into court, subject to whatever the court might do with it.

\*See also Wilmot v. Lyon & Co., 49 O. S., 296.

5. DEMAND REQUIRED, WHEN.

Demand is only required before replevin proceedings are commenced, when necessary to terminate the defendant's right of possession or confer the right of possession upon the plaintiff.

6. POSSESSION OF GOODS OBTAINED BY FRAUD.

Where goods have been obtained by fraud, the right of possession never passes to the purchaser at all. If the sale is elected to be rescinded, it is because there was no right on the part of the purchaser in the outset to the possession of such goods.

7. JUDICIAL NOTICE OF THE BUSINESS OF MERCANTILE AGENCIES.

Courts will take judicial notice of the nature of the business and the office of mercantile agencies.

8. REPRESENTATIONS MADE TO MERCANTILE AGENCIES.

Where a representation is made to a mercantile agency and that same representation is carried by the agency to the seller, that is substantially a representation made by the buyer to the seller.

9. ADMISSION OF STATEMENTS MADE TO A COMMERCIAL AGENCY.

The statements made to a commercial agency and also the statements made by the agency to its subscriber, the purchaser, are proper to be introduced in evidence to enable the jury to say whether the agency stated to the purchaser those things which it had been authorized to state to the latter or to anybody else who had any good reason for inquiring.

10. PURCHASE OF GOODS BY AN INSOLVENNT PERSON, EFFECT.

When a person buys goods, being insolvent, knowing that he is insolvent, and not intending to pay for those goods, such sale is fraudulent and void.

11. CONTRACT FOR THE PURCHASE OF GOODS ON CREDIT.

A contract for the purchase of goods on credit, made with the intent on the part of the purchaser not to pay for them is fraudulent.

12. PURCHASE OF GOODS WITH NO EXPECTATION TO PAY, EFFECT.

If the purchaser of goods has no reasonable expectation of being able to pay for them, such fact is equivalent to an intention not to pay.

13. ADMISSION OF EVIDENCE IN AN ACTION TO SET ASIDE A SALE ON THE GROUND OF FRAUD.

In an action to set aside a sale on the ground of fraud, it is competent to introduce false representations made by the purchaser to other persons, both before and after the sale, for the purpose of showing that there was a fraudulent concealment on the part of the purchaser not to pay for such goods.

14. ADMISSIONS OF AN AGENT.

The admissions of an agent, if they are to bind his principal, must be made in the execution of the purposes of his agency.

15. ADMISSIONS OF AN AGENT IN AN ACTION TO REPLEVIN GOODS FROM HIM.

Where goods are replevied from an agent of others, in which action the agent defends in his own name, any admissions of his which bore upon the subject of his right as an individual to hold the goods, can be used as against him, though such admissions were not made in the execution of the purposes of his agency.

ERROR to the Court of Common Pleas of Cuyahoga county.

BALDWIN, J.

This case comes into this court on a petition in error filed by the defendant below to reverse a judgment of the court of common pleas.

The action below was one of replevin for some goods which were claimed by John H. Lyon & Company to have been sold by them to the Chagrin Falls Paper Company. The action in replevin was not against the Chagrin Falls Paper Company, but against E. P. Wilmot. John H.

Lyon & Company claimed that the goods had been purchased from them by the Chagrin Falls Paper Company by fraud; and the frauds that they claimed were two. In the first place they claimed that the Paper Company had made statements of its condition to Bradstreet's Agency which were false and fraudulent, and that these statements had been communicated to them, and they relying upon these statements as true, had sold these goods to the Paper Company.

Secondly, they claim that the Paper Company was very largely insolvent; that the Paper Company, at the time that it bought these goods from the plaintiffs below, knew that it would be unable to pay for them, and absolutely intended not to pay for them; and it was claimed that the company had schemed to buy a large quantity of goods from various persons, which it had gotten into its possession; that the Paper Company then turned out the goods which were here replevined, with other goods, to certain favored creditors—some eleven or twelve in number—and those creditors delivered the goods to the defendant below, the plaintiff in error, as their agent; so that Wilmot held the goods as agent for the creditors to whom they had been mortgaged to secure their debts. It was not claimed that Wilmot stood as a purchaser, or in any better condition than the Chagrin Falls Paper Company, with some slight exceptions which I shall speak about as I go along.

The first question made was in regard to the sufficiency of the pleadings. The petition in replevin was the short form generally used. It first stated that the case came into the court of common pleas by appeal from the judgment of a justice of the peace. The petition then stated that the defendants, were E. P. Wilmot and E. B. Pratt—and I will say that E. B. Pratt dropped out of the case altogether; the goods were apparently in the possession of E. P. Wilmot alone, and I do not know but that the case was actually dismissed as to Pratt; but the substantial allegation of the petition is this:

"The said defendants, E. P. Wilmot and E. B. Pratt, wrongfully detain from plaintiffs the following goods and chattels of these plaintiffs, to-wit:"

(Then it goes on and describes the goods.) "Said defendants have wrongfully detained said goods and chattels for the space of —— days, to the damage of these plaintiffs in the sum of two hundred dollars."

The verdict of the jury and the judgment of the court were in favor of the plaintiffs below for the goods, but not for any damages.

It is said, in the first place, that there is here no allegation that the plaintiffs are the general owners of the goods, and that it is necessary that there be an allegation that they are either the general owners of the goods, or special owners, and that if they are special owners of the goods, then the facts must be set forth which entitle them to that special ownership; because there may be a general ownership, and there may be a special ownership which will entitle the special owner to hold the goods even as against the general owner.

Certainly there are no words in this petition that signify that the plaintiffs are the general owners of the goods unless such ownership is inferred from these words: "Wrongfully detain from plaintiffs the following goods and chattels of these plaintiffs."

Now, the form that is there used is substantially the form that was recommended by the Code Commissioners; and it is the form that is laid down in Bates on Pleading. The form in Bates on Pleading is: "The defendant wrongfully detains from plaintiff the following goods and chat-

tels of the plaintiff;" and that he takes to be equivalent to an allegation of the general ownership in the plaintiff. The form Wilcox gives is still shorter, and seems to be quite a different one. The form that Judge Swan gives in his book on Pleading, page 446, is like that in Bates. The form given in Nash's Pleading and Practice states more exactly the ownership. But this is substantially the form that has been in general use; and if it be true that that is not an allegation of general ownership, it is a question of a good deal of importance which has been largely overlooked by the profession.

There is not only that question made of there being a want of an allegation of general ownership, but two other objections are made to this petition.

It is said that the title of the plaintiffs at the time of the replevin being by virtue of a rescinded fraudulent sale, and they claiming on the ground that there was fraud practiced by the Chagrin Falls Paper Company, it was their duty to set forth in the petition the fraud. And then it is claimed further that the title of E. P. Wilmot was such that he was entitled to have the goods demanded of him before they were replevined, and that there should have been an allegation of a demand of the goods. I have named these questions, together because practically in the books they are considered in a measure together.

Now, the practice here and elsewhere has been, where goods are replevined on the ground that they have been fraudulently purchased, to use precisely the same short form. It has, in practice, been considered as being the rule that where a person claims as being the general owner of goods, under any circumstances whatever, the allegation should be made in this short form;—just as in actions in ejectment, for instance. An action in ejectment may be based precisely upon a claim of fraud; but it is not alleged and set forth. As far as the forms of the pleading is concerned, the two rest upon a somewhat different ground, because in the case of ejectment the Code expressly lays down what shall be a sufficient petition; but the Code does not in express terms lay down in actions in replevin, in the manner in which it does in actions of ejectment, what shall be a sufficient petition.

The two sections of the Code that relate to replevin which I shall read are:

"Section 5814. The possession of specific personal property may be recovered in an action as provided in this chapter."

"Section 5815. An order for the delivery of property to the plaintiff shall be issued by the clerk of the court in which the action is brought, when there is filed in his office an affidavit of the plaintiff, his agent or attorney, showing:

"*First*—A description of the property claimed.

"*Second*—That the plaintiff is the owner of the property, or has an interest therein; and if the ownership or interest is special or partial, the facts shall be stated.

"*Third*—That the property is wrongfully detained by the defendant.

"*Fourth*—That it was not taken on process issued against the plaintiff, nor for a tax; or, if taken on such process, that the property was exempt from execution expressly, or upon demand or selection by the plaintiff."

Now, the practice, as I have said, following the form here prescribed for the affidavit, has been that if the plaintiff claims a general ownership, he may just set it forth, either by the words, "that the plaintiff is

the owner of the property," or by the words " the goods and chattels of the plaintiff;" and the ownership is a special or partial one, then it has been the custom to set forth in the petition the acts which entitle the plaintiff to the possession of the property.

The use of this form seems to be generally sustained by the authorities. There is no direct authority in our own state. Mr. Nash, in his work on Pleading and Practice, says:

"I suppose a statement of facts is only necessary when the plaintiff claims a special property in the goods entitling him to the immediate possession of them as against the defendant, who is the general owner thereof."

A case in Col. 89, holds that the rule requiring fraud to be specially pleaded, does not apply in replevin. That is cited in Bates.

In a case in 55 N. Y., 671, the case of *Simmons* v. *Lyons*, it is expressly said that this form, "that the defendant has become possessed of and wrongfully detains from the plaintiff the following goods and chattels of the plaintiffs," is sufficient; and that doctrine was sustained in a case in 49 N. Y., 262; also in a case of *Hoisington* v. *Armstrong*, 22 Kan., 110. The cases have gone upon the ground that the question to be tried is whether or not the party is immediately entitled at the commencement of the suit to the possession of those goods, and that the fact to be alleged is whether or not he is entitled to that possession. And it is quite evident that it has been considered that the particular mode in which he might be entitled to that possession, has been regarded as a matter of evidence, and that if the plaintiffs had been the original owners of the goods, and they had been purchased from them by fraud, those were evidential facts, rather than the final facts which were to be stated in the pleadings.

That this section 5815, which does not in terms apply to the framing of the petition, is, after all, to be regarded in the framing of the petition, is recognized in our reports. I suppose the fact is that the forms in replevin follow the old practice; but discussing it simply on the Code as it stands, as I said, section 5815, regulates the form of the affidavit, and it does not say that the petition shall be in accordance with that form. But that the petition is to be framed substantially in the same manner, is recognized in the case of *Robinson* v. *Fitch*, 26 O. S., 663. That was a case where the defendant undertook to set forth what he said was a special ownership, and set forth the facts. The court said that although he had set forth those facts, and had not alleged that he was the general owner, yet the facts showed that he was the general owner, so that in that particular case his petition was just as good as if he had said in so many words, and in short words, that he was the general owner. The court say:

"The plaintiff only claimed in his petition to have a special property in the elephants; and counsels for the plaintiffs in error, assuming that he is confined to this claim, and that his rights are thereby limited to those of an owner of a special interest or property, contends that the petition does not state facts sufficient to entitle the plaintiff to recover on the ground of such special ownership. The second subdivision of section 175 of the Code provides that an order for delivery of property shall issue on the filing of a proper affidavit, showing 'that the plaintiff is the owner of the property, or has a special ownership or interest therein, stating the facts in relation thereto, and that he is entitled to the immediate possession of the same.' "

Wilmot v. Lyon & Co.

If, from the statements of the petition, it appeared that the plaintiff had only a special ownership or interest in the property replevined without stating the facts in relation thereto, it is probable that we would concur in the views of counsel for the plaintiff in error, and hold that the petition does not state facts sufficient to entitle the plaintiff to recover on the ground of a special ownership or interest; but we have above found, from the facts stated, that the plaintiff is the general owner of the property, and entitled to its immediate possession.

Therefore they said that the petition was sufficient, basing their decision upon a discussion of the same section, 5815.

We come, then, to this question next: Was this a general ownership? Granting that this petition, in form, is a good petition, so that a demurrer would not lie, was the interest of the plaintiffs in that action such an interest that they could not introduce those facts under this general petition? Because this petition simply alleged their rights to be that of general owners, an objection was taken to the introduction of the facts on the ground that under the facts as they were claimed in the evidence, the plaintiffs were special owners, and not general owners. In short, after goods have been purchased by fraud from a merchant, and the merchant undertakes to rescind the sale and replevin the property, is he the general owner, or has he a special property in those goods? I think it would ordinarily be the sense of the profession that if that sale was elected to be rescinded by the vendor, it was from that time on a void sale. The general theory in regard to fraudulent sales is, that when those sales are set aside, the sales are void; and in regard to real estate the courts have even gone so far in this state as to say that a creditor may levy upon a piece of land that has been conveyed, taking his chances afterwards of having the sale set aside; because, if the sale is fraudulent, the conveyance is void, and may be treated as such; and it does not seem easy to see, if that sale was elected to be rescinded, why the plaintiffs were not, as far as the title to that property was concerned, restored to their original rights—had the right to its possession, had the right to its sale, had the full and complete ownership of that property. And that, under the evidence in this case, these plaintiffs had the full and complete ownership of that property, the right to use it just as they pleased, and the right to sell it to anybody else, is established, unless there is some error in the proceedings, by the verdict of the jury and the judgment of the court below.

A special ownership is one which is partial, and is limited, and sometimes quite limited, in its character; for in the Fitch case the court held that the right of the mortgagee of the chattels to take them was that of a general owner.

It is said that no demand was made of the Chagrin Falls Paper Company, and that no tender back was made to the Chagrin Falls Paper Company of a note which had been given by the Chagrin Falls Paper Company to John H. Lyon & Co. for these goods, and that on that ground they had not fully elected to rescind this sale. There was evidence that a demand for the goods had been made of E. P. Wilmot, and that the note which had been made by the Chagrin Falls Paper Company to John H. Lyon & Co., had been tendered to him before the commencement of the suit.

But it is said that the sale, or contract of sale, having been made with the Chagrin Falls Paper Company, the demand should have been made of them, and that their note should have been tendered back to

them; and it is claimed that Wilmot stands in the position of an innocent holder of the goods. It is not claimed that he stands in any better position than the Chagrin Falls Paper Company would occupy, but it is said that the Chagrin Falls Paper Company, having come in possession of those goods by contract, came lawfully and properly into the possession of those goods, and that where parties have come lawfully and properly into the possession of goods, a replevin cannot be maintained until a demand has been made for the return of those goods. It is true that where a person comes lawfully and properly into the possession of goods and has a right to the possession, some steps must be taken to put an end to that possession, and this is generally, perhaps solely, by a demand. But the question arises most directly (because, for the purpose of discussing this question, we must assume that the purchase was a fraudulent purpose), the Chagrin Falls Paper Company having fraudulently purchased these goods of John H. Lyon & Co., did they come lawfully into the possession of these goods? Is it true that a person may obtain goods upon false pretenses, and then claim, as a rule upon which his case is to be heard, that he came lawfully into the possession of them? It seems to me that the bare statement of the question is sufficient to refute the proposition. It cannot be that a person who obtains goods by false pretenses, comes lawfully into their possession, and is entitled to demand for their return.

But it is said that this note was not returned to the Chagrin Falls Paper Company; that there was something which these plaintiffs got that they did not return. It appears very plainly that they held that note at the beginning of this suit and after they had replevined the goods. In fact, they brought that note in and tendered it in this suit, subject to whatever the court might say should be done with it. That note was then overdue. It is plain that the Chagrin Falls Paper Company could suffer no damage for the want of the return of that note to them. They could not be held liable upon it any further than was fair and just. The rights of John H. Lyon & Co. in that paper were subject to whatever changes were made in regard to the liability upon it by their proceedings in replevin; nor could they transfer any higher rights to any other person. So that no damage, particularly, would be done.

There is rather an early case in our state where this subject was discussed—the case of *Frost* v. *Lowry*, 15 O., 215. The judge delivering the opinion, says:

"Where goods are obtained by fraud, the purchaser acquires no lawful possession as against the vendor, for the reason that his assent to the delivery was procured by such means."

That case is one also to test the claim that plaintiffs could not recover because they had not returned the note to the Chagrin Falls Paper Company. One of the syllabi is:

"If A obtain goods of B by false pretenses, and gives therefor an accepted draft upon C, an accommodation acceptor, it is no defense to an action of replevin instituted by B against a stranger, in whose possession the goods are found, that the draft had not previously been returned by A."

It was claimed that there had been a waiver on the part of the original vendee of the return; but in that case the acceptance by the third party was brought into the suit, just as in this case the note was brought into the suit, with the name of the accommodation endorser

erased. That is, a change had been made in the form of the paper which was tendered in the suit. The court say:

"It is nevertheless true, that to enable the vendor to repossess himself of the goods, he must restore the vendee to his original rights. The consideration paid must be returned—the security given must be tendered back, or delivered up to be cancelled. But, if this be waived by the vendee, no other person has the right to complain, and such appears to us to be the case at bar. The bill was left, by the consent of Nathan L. Stout, with the attorney, subject to Stout's order with the acceptance erased. What reason had either the plaintiff in error Frost, or Rockhill, the attaching creditor, to complain of this? They had neither property in, nor lien upon this acceptance, and Stout had the perfect right to waive its return, or to receive the bill without it, and the result, in our view, would be precisely the same—the rescission of the contract."

That is, there being an accommodation acceptor, the paper, as far as Stout was concerned, in that case was equivalent practically to the note. But the court say:

"But suppose this were not so. Useless and idle ceremonies are neither favorites of the law, nor required by common sense; and if the withholding of the acceptance can, in no event, be of prejudice to Stout, its return is by no means necessary to enable the defendants in error to reclaim the property."

Now, in this case at bar, could these plaintiffs both recover these goods in replevin and then recover the price of them of the Chagrin Falls Paper Company? We are unable to see that the Chagrin Falls Paper Company suffers any damage whatever by the note being precisely where it is.

The rule laid down in *Smith & Co.* v. *McLean*, in 24 Iowa, 322, is:

"Demand is only required before replevin when necessary to terminate the defendant's right of possession or confer the right of possession upon the plaintiff."

Now, where goods have been obtained by fraud, by false pretenses, the right of possession never passed to the defendant at all. If the sale is elected to be rescinded, it is because there was no right on the part of the defendant in the outset to the possession of those goods.

"Nor," say the court of appeals in *Scofield* v. *Whitelegge*, 49 N. Y., 262, "is there any necessity for a demand where there was a wrongful taking."

A case very similar to this case—perhaps most similar to this case—is one decided by the supreme court of Illinois in the present year, and not yet reported in the regular reports, but which is to be found in 9 Wests' Rep., 498.

A great deal of interesting discussion was had upon the subject of ˍne false representations which were claimed to have been made in this case. There were no representations made directly by the Chagrin Falls Paper Company to John H. Lyon & Co., but there was a statement made by the Chagrin Falls Paper Company to Bradstreet's Commercial Agency in the year 1880. This sale took place in the latter part of the year 1883. The goods, perhaps, were delivered by John H. Lyon & Co. to the Chagrin Falls Paper Company in December, 1883, there having been prior negotiation, which was had mainly through a man by the name of Beebe. The plaintiff received from the agency, in October, 1883, a report based, as is claimed, upon a report made by the paper company in 1880. In November, 1883, the Chagrin Falls Paper Company made to Bradstreet's

7 Dec. 26.

a similar statement to that made in 1880, but that did not reach the plaintiffs, the vendors, before they delivered the goods, although it was actually made to Bradstreet's in New York, and appeared upon their books a little before the time of the delivery of the goods.

The statement made to Bradstreet's in 1880 was this: That the corporate style was "The Chagrin Falls Paper Company;" that it was located in Cuyahoga county, Ohio; that its officers were: President, D. L. Pope; agent, I. W. Pope; secretary and treasurer, L. I. Pope; that the date of the charter was December 27, 1873; that the date of the organization was January 3, 1875; that the date of the commencement of business was January, 1876; that the capital authorized was $100,000; that the capital subscribed was $50,000, and that the capital paid up was $50,000. The matter that was claimed to be fraudulent in this statement was the representation that the capital paid in was $50,000. It was claimed that the capital paid in was not $50,000.

The statement made by Bradstreet's Agency to the plaintiff was this:

"The Chagrin Falls Paper Company of Chagrin Falls, Ohio, Cuyahoga county. D. L. Pope, president; L. I. Pope, secretary and treasurer; I. W. Pope, agent. A stock company, chartered in ecember, 1875, under Ohio laws, with an authorized capital of $100,000, of which $50,000 is claimed paid in, consisting of real estate, machinery, etc. Business was not actually commenced until January, 1876."

Perhaps I might as well read that other report right in this same place. The report to Bradstreet's November 27, 1883, was:

"A stock company, chartered under Ohio laws in December, 1873, with an authorized capital stock of $100,000, of which $50,000 is paid up. Shares $50 each. None for sale. Real estate, plant, etc., valued at $40,000. Insured for that sum, and is clear. We have a surplus of $15,000. Have from $32,000 to $35,000 in stock on hand, with liabilities of about $35,000."

It was claimed that the payment of that $50,000 was fraudulent. It was claimed that it was paid in real estate and other property making the plant, and that the property was very largely over-valued; that, in addition to largely over-valuing the property which went to pay the $50,000, the paper company assumed and undertook to pay some twenty odd thousand dollars of previous debts of Pope, the man who made the subscription, and who undertook to pay for his $50,000 of stock with that property. So that it was not only over-valuation but it was a clean payment or assumption over and above that by the paper company of some $20,000. And it was said (perhaps it makes no difference with the facts in this case) that a part of these very preferred debts arose out of those payments undertaken to be made by the Chagrin Falls Paper Company.

There are several replies made to this claim of fraud. It is said that the company had it in its power to make such bargain as it pleased in regard to the disposition of stock. In view of our statute, it hardly seems necessary to discuss that point very much, because other stockholders and creditors have some right in the matter. Nor, perhaps, does that point fairly arise in this case, because the question whether or not, as between the stockholders and the company, the company had a right to make such bargain as it pleased in regard to the disposition of its stock would not, perhaps, be entirely decisive with regard to the representations made to other persons. It is a fact, however, and the law, that stock must be fairly paid up. If it had been in the power of the corpo-

ration to waive the paying up of that stock, still when these parties undertook to tell the Commercial Agency that that stock was paid up with $50,000, they made a substantial statement of fact which, it is claimed, might rightfully be relied upon by other persons.

But it is said that this representation was not made to John H. Lyon & Co., and that it is necessary that a false representation be made to the person who sells the property, and who not only had a right to rely upon it, but who had a right to rely upon it as made to him. And that brings up (and we only propose to discuss it briefly) the situation of commercial agencies. It seems to be a business of which, as is suggested, the court should take judicial notice. We all know perfectly well the manner in which the business is done. These mercantile agencies have agencies in all of the principal business towns of the United States; they do a vast business, influencing, by the representations which they make to their patrons, almost the entire business of the country. The very purpose for which they are organized and do their business is to state to people who sell goods the condition of those who wish to buy. So that the whole purpose of their organization and of their business is, practically, to carry representations. At any rate, a very large share of their information is, very properly, made up from the statements of the purchasers throughout the country. That is the most reliable source of information, and that which the Commercial Agency has the best right to rely upon; and the principal business of these mercantile agencies is to carry these statements from the buyers to the sellers. In this case I have read the statement made by the Chagrin Falls Paper Company itself.

Now, it cannot be true that representations must always be made by word of mouth. A corporation can never act except by agents of some kind. So that if the doctrine is true that a representation can never be made by an agent, then a corporation can never be guilty of fraud—a doctrine which has been expressly 'sat down upon" by our supreme court. Now, why may not a representation be made and carried as well by a company whose business it is to do that very thing as by any other agent? We are unable to see that there is any distinction between the one and the other. There have been numerous cases upon this subject, and they have uniformly held that where a representation is made to a mercantile agency, and that same representation is carried by the agency to the seller, that is substantially a representation made by the buyer; and it cannot be anything else. The very purpose for which the Chagrin Falls Paper Company made that statement to Bradstreet's Commercial Agency was to have Bradstreet's Agency tell persons of whom they wished to buy what their condition was.

Objection was made to the introduction of the statement made to the agency, and also to the introduction of the statement made by the agency to the purchaser. But it is very plain that the representations made by the Chagrin Falls Paper Company to John H. Lyon & Co. consisted of just two things—the representation made to the Bradstreet Agency, and the statement made by it to John H. Lyon & Co. They were both proper to be introduced to enable the jury to say whether Bradstreet's Agency stated to John H. Lyon & Co. those things which it had been authorized to state to John H. Lyon & Co, or to anybody else who had any good reason for inquiring.

It is said that this representation was made much too long before the sale. This representation was made in 1880, and the sale was made

in 1883. But the court left it to the jury whether or not the representation made to Bradstreet's Commercial Agency was a continuing representation. That was excepted to. Now, if the court ought not to have left that to the jury, the court ought to have determined it for itself; and it really seems impossible to say that that representation made to Bradstreet's Agency was not made for the purpose of being a continuing representation. It was a statement of a past matter of fact. Now, a statement of a past matter of fact is true or untrue, and it always remains either true or untrue. If a representation had been made of the then condition of the Chagrin Falls Paper Company, and that condition had changed afterwards or had not changed afterwards, it could not be said that that was a representation continuing in the sense that the seller would be authorized to conclude that after that the condition of the Chagrin Falls Paper Company had been unchanged. But here was a statement which expressly represented what had been done at the organization of the company—past facts, which if they were once true were true forever, and which if they were once false were false forever. The representation made in November, 1883, before these goods were received by the Chagrin Falls Paper Company, was substantially the same, manifesting that if the Chagrin Falls Paper Company intended fraud by that first representation that was made, it persisted in that fraud and in that claim in November, 1883.

But it is said that the representation made by Bradstreet's Agency to John H. Lyon & Co. was that it was claimed that $50,000 had been paid in. What did that mean? It is said that that was literally true—it was claimed that $50,000 was paid in. It might not have been true that $50,000 had been paid in, but it was true that it was claimed that $50,000 had been paid in. Now, what was the fair meaning of that when it reached John H. Lyon & Co.? It plainly was a statement on the part of the agency that the Chagrin Falls Paper Company claimed— said in short—that $50,000 had been paid in. And it does not seem to us that the merits of the case ought to turn on the technical use of language, the fair meaning of which is very easy to understand.

I will refer to one case on the subject of commercial agency that is the case of *Eaton, Cole & Burnham Company* v. *Avery*, 83 N. Y.

"Where a member of a firm makes to a mercantile agency statements known to him to be false as to the capital invested in the firm business, with the intent that the statements shall be communicated to persons interested in ascertaining the pecuniary responsibility of the firm, designing thus to procure credit and to defraud such persons, and such statements are communicated to one who in reliance thereon sells goods to the firm upon credit, an action for deceit is maintainable at the suit of the vendor against the partner making such false representations.

"It seems that the court will take judicial notice of the nature of the business and the office of mercantile agencies."

That does not seem to be altogether what the court did in this instance; but that certainly was a matter which, if left to the jury, the defendant below could not complain of, because the conclusion of the court, so far as the nature of commercial agencies is concerned, could not possibly have been different from that which was found by the jury.

It is said that these goods were bought through one Beebe. It seems that they were bought through correspondence with a man by the name of Beebe, who seems to have been a broker; the terms of sale were agreed upon by him, and the order was turned over to John H.

Lyon & Co., who filled it.; and it is said that therefore these parties had no right to rely upon it, Now, that makes no difference. They purchased these goods of John H. Lyon & Co., received them from John H. Lyon & Co., were bound to pay John H. Lyon & Co. The contract was between them and John H. Lyon & Co. There cannot be any doubt about that. And it makes no difference whether it was the same contract in regard to which Beebe acted or not. If by a contract they bought these goods of John H. Lyon & Co., then John H. Lyon & Co. had just as much right to rely upon the representations that were made to the agency as any other vendor. The representation made to the agency, was for the very purpose, without any reference being made directly to the Chagrin Falls Paper Company, of enabling any person of whom they bought or proposed to buy goods to know what was their condition.

I may say that there was testimony that Bradstreet's report was in the office of the Chagrin Falls Paper Company, and that they referred to it from time to time. But, after all, it seems difficult to see why this false statement of past fact was not made by them for the very purpose of being relied upon just as long as it was upon the books of Bradstreet's Agency as a substantial statement of past fact.

The Chagrin Falls Paper Company were somewhat unfortunate in their business, and it is said that when they made this purchase they were largely insolvent—totally unable to pay for those goods ; that there could not have been any reasonable expectation that they would be able to pay for them ; that they knew they could not pay for them, and that they never intended to pay for them. It was claimed, substantially, that there was a scheme of fraud, so far as the obtaining of credit was concerned, from the beginning; that the statement first made of their condition in 1880 was fraudulent, and they obtained credit by that; that they gradually went on in their business, and that when they saw that they were bound to fail their stock was transferred to one of their members, the president of the company, who was totally insolvent, except, perhaps, single shares of $100 each to enable directors to qualify; that they then made very much larger purchases of goods than they ordinarily made, buying wherever they could obtain goods upon credit, and acquired in that manner a stock sufficient, it was claimed, to last them for a long time, and much larger than they had on hand before; so that they had on hand at the time of their failure a much larger stock of goods than they had at any previous time; and that that was done for the purpose of procuring it from these various vendors, and turning it over to the preferred creditors, and that the suit is between one of these vendors and these preferred creditors for such goods as are claimed to have been bought of the plaintiffs in this general scheme of fraud.

There was naturally a good deal of discussion in the case as to what kind of a fraudulant concealment of condition would result in making a contract of sale fraudulant. That when a person buys goods, being insolvent, knowing that he is insolvent, and not intending to pay for those goods, that sale is fraudulent, has been decided by the courts of quite a number of states, and by the supreme court of the United States in 93 U. S. R. These cases seem to be unanimous that under such circumstances such a sale is fraudulent and void. The leading case in this state—in fact, substantially the only case in this state—goes further. That is the case of *Talcot* v. *Henderson*, 31 O. S., 162, which

went up from this county, and arose through the insolvency of De Forest & Co., of this city. The first syllabus in that case is:

"A contract for the purchase of goods on credit, made with an intent on the part of the purchaser not to pay for them, is fraudulent."

That follows precisely the doctrine that has been laid down in all the cases. The court adds, and it is to this part that the exception is taken, it being claimed that this language was not authorized to be used in this case, that it is not the law, and that if the supreme court intended it to be laid down as the law, they were mistaken:

"And if the purchaser has no reasonable expectation of being able to pay, it is equivalent to an intention not to pay."

It is said that the judge below delivered such a charge as was calculated to mislead and confuse the jury. The charge which he delivered to the jury which it is said was calculated to confuse and mislead the jury, was the reading to them of the syllabus which I have just read, and also such part of the opinion of the court sustaining that as the judge saw proper to read. So that if the judge below did deliver a charge that was calculated to confuse and mislead the jury, it was because he delivered to them the law as laid down by the supreme court.

It is said that a judge may confuse and mislead a jury by delivering to them law that is perfectly correct, but inapplicable; and that is true. But it seems as if the circumstances and the evidence in this case were similar in character to the circumstances and evidence in the case at bar. So that that law laid down by the supreme court was applicable here. Judge McIlvaine, in delivering the opinion, says:

"An intention on the part of the purchaser of goods not to pay for them, existing at the time of purchase, and concealed from the vendor, is, undoubtedly, such a fraud as will vitiate the contract. But it is certainly true, on the other hand that, where no such fraudulent intent exists, the mere fact that the purchaser has knowledge that his debts exceed his assets, though the fact be unknown and undisclosed to the vendor, will not vitiate the purchase.

"Whether, therefore, a contract of purchase, where the purchaser fails to disclose his known insolvency, is fraudulent or not, depends on the intention of the purchaser; and whether that intention was to pay or not to pay, is a question of fact, and not a question of law.

"In the solution of this question, though it be one of fact, it is true however, that certain presumptions arise, which are entitled to consideration and force.

"Thus, while it may be said that fraud must be proved, and will not be presumed, there is a presumption that every reasonable person anticipates and intends the ordinary and probable consequences of known causes and conditions. Hence, if a purchaser of goods has knowledge of his own insolvency, and of his inability to pay for them, his intention not to pay should be presumed. I would go a step further, and hold that an insolvent purchaser, without reasonable expectations of ability to pay, should be presumed to intend not to pay. Indeed I would not deny that an intention not to pay might be inferred from the mere fact that the purchaser had undisclosed knowledge of his gross insolvency; but, in such case, the inference may be rebutted by other facts and circumstances."

Now, it is said that this was *obiter* in this case. The fact is that the verdict of the jury in the case of *Talcott* v. *Henderson, supra*, was the other way. The facts were similar to the facts in the case at bar, as were

the claims made. Of course, the evidence may be much stronger in one case than in the other. This case goes further than any other case, anywhere. The law is laid down much more strongly in Ohio than it is anywhere else. The judge delivering the opinion, says further :

"True, the decisions of different courts upon this question are not uniform. The discrepancies, however, are not so much on the point whether a fraudulent intent on the part of the purchaser is necessary to avoid the purchase, as to the question of conclusiveness, under the circumstances of each case, of the inference of fraudulent intent, from the fact that the purchaser had knowledge of his insolvency, and failed to disclose it to the vendor.

"There is no well considered case, as far as I have examined the authorities, which holds that fraud is conclusively presumed from these facts alone. Where, in addition, it is shown that the appearance and circumstances of the purchaser indicate solvency and wealth, there are cases which hold the inference of fraudulent intent to be conclusive. Of course, we admit that if the appearance of solvency be assumed for the purpose of deceiving, as in 1 Root, 58, the existence of fraud is actually shown ; but we think that where such appearance is entirely innocent, the question of the existence of fraud is still open to further inquiry.

"From these views, how stands the case before us? At the date of the contract, De Forest & Son were largely insolvent. They had knowledge of the fact, and did not disclose it to the plaintiff, who was ignorant of it. They were also in possession of a large stock of merchandise, and were doing an extensive business. From these facts, it might well be inferred that they intended to obtain the plaintiff's goods without paying for them ; at least, that they had no reasonable expectation of being able to pay for them at the maturity of their promise. If the court below had so found, we would not disturb the finding."

Now, it certainly seems that the court was justified in laying down the law as it did. This clause that is objected to, "and if the purchaser has no reasonable expectation of being able to pay," it is equivalent to an intention not to pay is a matter the consideration of which arose solely out of the facts of that case, and it is simply our business to apply the law as laid down by the supreme court ; and, as I have said the objection that is made to the charge of the court below, is that he read to the jury this very law, which, if it is good law, is applicable to the circumstances and evidence in this case.

There were various exceptions taken to the evidence—in fact, I believe there were over a hundred of them in this case, but it is not necessary for us to discuss them at length. They run very largely into classes, which are practically disposed of by the discussion which we have already had. We could take a large amount of time in the discussion of each particular objection, but there are quite a number which we do not deem it necessary, although we have looked at them, to discuss. There are, however, general exceptions to a considerable class of evidence.

There were allowed in evidence in this case representations that had been made to other parties. There were allowed, as has been seen, representations made to Bradstreet's Agency in November, 1883, which was after any representations reached these plaintiffs, because the representations reached them in October, 1883.

Before the sale was made there were representations made to divers other persons; one in February, 1883, and possibly one after the sale was made ; and the admissions of these representations to other persons

was objected to. It was not denied that it was quite competent to introduce false representations made to other persons to help sustain the charge that false representations were made to the plaiuiff, in some instances. But this nice question was made: Whether, if the jury came to the conclusion that there was no fraud in the representations that had been made to Bradstreets, these representations would bear upon the question of whether there was a fraudulent concealment. The court told the jury that if they came to the conclusion that there was no fraud in the original representations made, or that this sale was not void on account of false representations, nevertheless, these fraudulent representations made at other times and to other persons were admissible for the purpose of showing that there was a fraudulent concealment of their condition, and an intention on the part of that corporation not to pay John H. Lyon & Co. for those goods.

Now, the claim made by the plaintiffs below was that there was, as I have said, this general scheme of fraud, in pursuance of which they purchased during the last year a very large and unusual amount of goods of these various vendors with the intention of not paying for them, but of turning them over to certain creditors whom they designed to prefer. In short, it was claimed that it was a scheme by which, being indebted to various parties whom they desired to pay, they proposed to get the goods of other persons and turn them over to these parties, and that they did that, very likely, where they could, by simply concealing their gross insolvency, taking the goods without an intention to pay for them, which was a clear fraud. Now, if there was that fraudulent scheme on the part of the Chagrin Falls Paper Company, why does not testimony as to representations which were fraudulent and false, made by them to various persons in the furtherance of that scheme, tend most directly to show whether or not there was a fraudulent intention on the part of the Chagrin Falls Paper Company in their conduct toward the plaintiffs? It seems as if there could hardly be any more direct evidence. I do not see why it is not as forcible and as pointed to show fraud in the one case as in the other—and, on my word, it seems almost even more so.

But it is said that our own supreme court has given some intimation upon that point. I will read first a brief decision in *Hall* v. *Naylor*, 18 N. Y. 588, which is a decision directly upon that point:

"Where the question is whether a vendee of goods procured the sale of them through fraud, evidence is admissible of purchases made by him at or about the same time, involving similar frauds.

"Evidence is admissible of co-temporaneous sales procured by affirmative representations of the purchaser's solvency, though the issue is upon an alleged fraudulent concealment of facts material to his credit."

Comstock, J., says: "It does not appear that Kerr & Company, on purchasing the goods in question, made any representations of their ability to pay for them. If, however, they concealed the fact of their insolvency, with a design of procuring the goods and not paying for them, it was a fraud which rendered the sale void, if the plaintiff chose so to regard it. On the trial of such an issue, the *quo animo* of such a transaction is the fact to be arrived at; and it is, therefore, competent to show that the party accused was engaged in other similar frauds at or about the same time. The transactions must be so connected in point of time, and so similar in their other relations, that the same motive may reasonably be imputed to them all. It is not necessary, however, that the means of accomplishing each fraud should be the same. Where the question is,

whether goods have been procured by a fraudulent suppression of facts material to credit given, it will be competent to prove that, in other instances, they have been obtained by actual misrepresentation, concerning the same facts. The concealment in one case, and false representation in the other, are evidence merely of a fraudulent design, common to both transactions, of procuring goods without the ability or the intention to pay for them. These observations are a sufficient answer to several objections which were taken at the trial to the admission of the evidence."

I will say right here that although these representations have been very generally and freely admitted, from a careful examination which we have made of the authorities on that subject, it is quite evident that the courts have differed in the reasons that they have given for such admission.

It is said that there has been an intimation, as I said, by our own supreme court, that they would not be admitted, and that is based upon this language in the case of the *United States Life Insurance Company* v. *Frank H. Wright*, 33 O. S., 533 :

"Where a recovery is sought on the ground of fraudulent representations made to the party aggrieved, similar representations made by the same persons to others, are admissible in evidence only for the purpose of showing that they were known to be false by the person making them ; therefore, where there is no evidence tending to show such knowledge, they should be excluded."

The court undertook to tell the jury in this case that they not only bore upon the subject of false representations, but they bore upon the subject of fraudulent concealment. Now, it will be noticed that this is carefully limited by the supreme court to a case where a recovery is sought upon the ground of false representations; but a recovery was sought in this case not only upon the ground of false representations, but on the ground of fraudulent concealment, and the court evidently do not mean to say there at all that such evidence would not be admitted where the issue was one of fraudulent concealment ; and the trouble in that case was precisely this ; There was no evidence at all that the representations which were made to the party claiming fraud were false. The court say :

" This evidence was admissible for no other purpose than to show that the representations made to plaintiff were known by the agent to be false. There was, however, no evidence given tending to show that the statements made to others were false, or known by the agent to be untrue. The evidence, then, afforded no light upon the point on which alone it was admissible ; and therefore should have been ruled from the jury."

In the case of *Edwards* v. *Owens*, 15 O., 500, it is said that " proof of general representations made at the same time to others, by which they were defrauded, may be given in evidence to show the intention of the debtor in making the false representations complained of."

That is limited by the language employed there, but at the same time it is evident that in that case, and in every case, it is impossible that the representations should be made at precisely the same time, and we know of no case which has lowered the limitation below that which was laid down by the court of appeals in this case in N. Y.

There is an analogous case, viz.: *George Brown* v. *The State of Ohio*, 26 O. S., 176. It was claimed that the defendant below had injured horses of his neighbors. His business was to cure horses, and he told his neigh-

bors that an epidemic was coming on that would injure horses, for the purpose of treating them. Testimony was admitted of similar damage done to other horses. The court say:

"While the general rule unquestionably is, that a distinct crime, in no way connected with that upon which the defendant stands indicted, cannot be given in evidence against him on trial, this rule is not applicable to a case in which it is clearly shown that a connection, in the mind of the defendant, must have existed between the offense charged in the indictment and others of a similar nature. When such connection exists, evidence of such other offense is admissible, not for the purpose of raising a presumption of guilt on the hypothesis that a man who commits one crime will probably commit another, but for the purpose of showing a motive or purpose prompting the commission of the offense laid in the indictment; and being competent for this purpose, it could not have properly excluded on the ground that it tended to prove the commission of other and distinct offenses."

I think that is a happier statement than is sometimes made of the ground on which these false representations are admitted.

It is said that there was error in admitting an admission of Mr. Wilmot regarding the value of the property. It will be noticed that it was one part of the case of the plaintiffs to show that the Chagrin Falls Paper Company, at the time of that purchase, was largely insolvent, which, of course, would be done by a comparison of its property with its liability. Wilmot was called upon by them to testify in a deposition, and testimony was introduced upon the stand of statements which he then made.

The objection made to them was that he was the agent of these creditors, and that they were undertaking to use the admission of the agent, not made in the line of his agency, against the principals. The rule is very well established that the admissions of an agent, if they are to bind his principal, must be made in the execution of the purposes of his agency. It is plain that Wilmot, who was the defendant in this case, and who was obliged by the plaintiffs to attend before a notary public and give his deposition, was not in that instance their agent in making those admissions. He did it very much against his own will, very likely, and just as likely against the will of those who were alleged to be his principals; and the question arises directly, what was the relation of Wilmot, as far as this suit is concerned, in regard to admissions which he was not authorized to make by those parties who are claimed to be his principals? It is said that whatever takes place in this suit binds the principals—that they are privy to this action. It is not necessary for us to pass upon that question one way or the other; but it is quite certain that Mr. Wilmot himself had a personal interest in this case. He was liable for the costs; damages were claimed against him; and we cannot see why, when the question in this case, as between these plaintiffs and E. P. Wilmot, was whether E. P. Wilmot had the right to the possession of these goods as against them, any admission of his which bore upon the subject of his right as an individual to hold those goods against them could not be used as against him. No authority was produced at all— it was said that the question was new. It probably is new for the reason that it never has been maintained that an admission under such circumstances was not admissible.

We have discussed, I believe, all the questions which we have thought it necessary to discuss, and at somewhat more length than I expected to when I commenced.

The judgment of the court below will be affirmed.

*Estep, Dickey & Squire,* for Plaintiffs in Error.

*Everett, Dellenbaugh & Weed,* for Defendants in Error.

(Affirmed by the supreme court, see *Per Curiam*, 49 O. S. 296.)

---

## PARTNERSHIP—PLEADING—JUDGMENT.